## INCLINATIONS

It is Judge Mollway's practice, whenever possible, to notify attorneys and pro se parties scheduled to argue motions before her of her inclinations on the motions and the reasons for the inclinations. This is part of Judge Mollway's normal practice, rather than a procedure unique to a particular case, and is designed to help the advocates prepare for oral argument. It is the judge's hope that the advance notice of her inclination and the accompanying reasons will focus the oral argument and permit the advocates to use the hearing to show the judge why she is mistaken or why she is correct. The judge is not bound by the inclination and sometimes departs from the inclination in light of oral argument.

Judge Mollway attempts to communicate her inclinations no later than one working day before a hearing. The court's preference is to distribute the inclinations to the parties via the court's electronic filing system ("CM/ECF"). Accordingly, parties are encouraged to participate in the court's CM/ECF system.

The inclination is intended to be only a summary of the court's thinking before the hearing and not a complete legal discussion. The court will issue a written order with a detailed analysis after the hearing.

The parties are reminded that, under Local Rule 7.4, they may not submit supplemental briefs (such as briefs addressing the inclination) unless authorized by the court. Supplemental declarations, affidavits, and/or other evidence in response to the court's inclinations are prohibited unless authorized by the court. The parties are also reminded that they must comply with Local Rule 7.8 if they intend to rely on uncited authorities at the hearing.

Occasionally, Judge Mollway does not announce an inclination, especially if materials are submitted to her right before the hearing. Because briefing on criminal motions closes just a few days before the hearing, it is not uncommon for her to be unable to announce an inclination on a criminal motion until the start of the hearing itself. Certainly if an evidentiary hearing is scheduled on matters necessary to a decision on either a civil or criminal motion, no inclination will be announced.

Judge Mollway's inclinations may not be cited as authority for any proposition. However, the inclinations will be electronically filed for the convenience of the parties.

Judge Mollway announces the following inclinations:

**In re Morning Star Cruises, Inc.**, Civ. Nos. 03-00672 SOM/BMK and 04-00588 SOM/BMK (Consolidated)

This case arises out of an underwater excursion that allegedly led to the drowning of Mitsuko Fukuoka during a "SNUBA" or a "SeaWalker" activity.  In August 2002, Morning Star Cruises, Inc., took Mitsuko Fukuoka, her husband (Shiroh Fukuoka), and her minor daughter (Miho Fukuoka), all Japanese citizens, to a place on the water.  There, the Fukuokas put on diving helmets connected to air tubes and went underwater, thinking they would be breathing air pumped into their helmets from the surface.  Somehow, Mitsuko Fukuoka drowned (the "Accident").

On July 21, 2006, Morning Star Cruises filed a motion for summary judgment, seeking exoneration from or limitation of liability under 46 U.S.C. §§ 181 to 195 (the "Limitation Act").  The court is inclined to deny this motion.

The court is inclined to rule that Morning Star has not met its initial burden of showing on this motion that it was not negligent.  Morning Star has merely submitted a declaration indicating that its "staff is trained to follow safety procedures in the event of an emergency," its "crewmembers were trained in the operation, instruction, and first aid procedures for the 'SeaWalker' activity," and its "crew responded to Mitsuko Fukuoka in accordance with [its] procedures."  See Affidavit of Paul S. K. Yip (July 21, 2006) ¶¶ 3-5.  Morning Star concludes that it "was in no way negligent in the injury of Mitsuko Fukuoka."  See Yip Aff. ¶ 9.  The court is inclined to rule that Yip's Affidavit does not explain how Mitsuko Fukuoka drowned and therefore does not demonstrate that Morning Star was free of responsibility for her death.  In other words, the court is inclined to rule that, just because Morning Star's employees were "trained" and just because they acted in accordance with procedures, that does not mean that Morning Star had no negligence, as the training and procedures might have been insufficient.[1]

---

[1] Morning Star argues that, under Local Rule 56.1(g), the Fukuokas are deemed to have admitted all of the material facts set forth in its concise statement because the Fukuoka's have not controverted Morning Star's concise statement with a separate concise statement of their own.  For purposes of this motion, the court is inclined to assume that there is no dispute that Morning Star's employees were trained or that they acted in accordance with their training and procedures.  Morning Star's concise statement asserts that it was not negligent, but the court is inclined to rule that this is an assertion of law.

The court is inclined to rule that a question of fact exists as to whether Morning Star negligently caused the death of Mitsuko Fukuoka, as the court lacks details surrounding the Accident.  The Fukuokas' expert, Thomas C. Ebro, issued a preliminary report on June 24, 2005.  The court is inclined to rule that Ebro's expert report raises the possibility that Morning Star was negligent because (1) its employees may not have ensured that water would stay outside of Mitsuko Fukuoka's air-filled helmet, (2) its employees may not have recognized or may have recognized too late that Mitsuko Fukuoka was having trouble underwater, (3) Morning Star may not have had sufficient employees available to respond to her plight and safely transport her back to the surface and/or a hospital, and (4) its employees may not have properly responded to her plight and safely transported her back to the surface and/or a hospital.

Morning Star argues that Ebro's opinions should be disregarded as unreliable because they refer to a "SNUBA" activity, while Mitsuko Fukuoka drowned during a "SeaWalker" activity.  Morning Star also argues that Ebro's opinions should be disregarded as unreliable because his preliminary report was issued before any discovery was requested or produced.  The court is inclined to rule that neither of these situations makes Ebro's opinions unreliable.  It is undisputed that Mitsuko Fukuoka was wearing some type of helmet that was supposed to allow her to breathe underwater.  It is also undisputed that Mitsuko Fukuoka's drowning occurred while wearing that helmet.  Ebro's opinion that water does not normally get into a helmet does not appear to turn on any difference between "SNUBA" and "SeaWalker" activities.  Nor do his opinions as to whether Morning Star properly monitored and responded to her plight appear to turn on any difference between "SNUBA" and "SeaWalker" activities.  The issuance of the opinion before the Fukuokas conducted discovery appears to go to the weight, rather than the admissibility, of his opinions.

The Fukuokas should come to the hearing prepared to state why the interrogatories attached as Exhibits 2 and 3 to the Opposition are not signed.  In those interrogatories, Mitsuko Fukuoka's husband and daughter both indicate that she had been underwater for only a few minutes before giving the distress sign and that she tried to climb up the dive ladder to the boat on the surface.  The interrogatory answers indicate that Mitsuko Fukuoka passed out while climbing up and fell back towards the ocean floor.  She then had to be pulled to the surface.  <u>See</u> Response

---

Local Rule 56.1(g) applies to "material facts," not conclusions of law.

to Interrogatory No. 9 to Miho Fukuoka (Ex. 2); Response to Interrogatory No. 9 to Shiroh Fukuoka (Ex. 3).  The court is inclined to rule that the interrogatory answers establish an issue of fact as to how water got into Mitsuko Fukuoka's helmet. It may be that when she fell towards the ocean floor water entered her helmet, causing her to drown.  It appears that she was being assisted to the surface by a Morning Star employee when she fell back towards the ocean floor, and the court is inclined to rule that there is a question of fact as to whether Morning Star negligently responded to Mitsuko Fukuoka's situation.  It might be that a Morning Star employee was negligent in helping her up the ladder, allowing her to fall backward and to have water enter her helmet.

   The court is further inclined to rule that there is a question of fact as to whether Morning Star was negligent based on the ambulance and emergency room reports, Exhibits 4 and 5 to the Opposition, which both indicate that Mitsuko Fukuoka was helped to the surface.  The ambulance report states that "Dive Staff" told the emergency medical technicians ("EMTs") that Mitsuko Fukuoka was "pulled from water unresponsive while ascending from [approximately] 15 ft. of seawater while 'snuba' type diving."  The ambulance report further indicates that the "Staff" told the EMTs that Mitsuko Fukuoka was "assisted to [the] surface."  The Castle Medical Center report similarly indicates that Mitsuko Fukuoka was "assisted" to the surface.  Because the ambulance and medical reports contain statements made for purposes of medical diagnosis or treatment and are describing the inception or general character of the cause of Mitsuko Fukuoka's medical problem, the court is inclined to consider them on this motion.  See Fed. R. Evid. 803(4); Hopkins v. Andaya, 958 F.2d 881, 886 (9th Cir. 1992) ("The medical report containing Andaya's statement to the medical staff was submitted by Hopkins in opposition to the motion for summary judgment; it is competent evidence that the district court may consider under Rule 56(c)."), overruled on other grounds as recognized in Federman v. County of Kern, 61 Fed. Appx. 438, 440 (9th Cir. 2003) (unpublished).  The court is therefore inclined to rule that there is a question of fact as to whether a Morning Star employee allowed her to fall back toward the ocean floor, thus causing water to enter her helmet.

   Morning Star's motion also seeks a determination that, even if it acted negligently, it is entitled to a limitation of its liability because it had no "knowledge or privity to the ship's negligence or unseaworthiness."  Even assuming that this court may determine whether Morning Star is entitled to a limitation of its liability without first determining whether

Morning Star was negligent, the court is inclined to rule that there is a question of fact as to whether Morning Star had knowledge or privity with respect to the alleged negligence.  If Morning Star's employees were negligent, the court is inclined to rule that that negligence might be imputed to Morning Star if the employee was acting within the scope of his or her employment or if Morning Star's training of its employees and its safety procedures were insufficient.