IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| In the Matter | ) | CIV. NO. 03-00672 SOM/BMK |
| | ) | (consolidated) |
| of | ) | |
| | ) | |
| The Complaint of MORNING STAR | ) | ORDER DENYING MORNING STAR |
| CRUISES, INC., a Hawaii | ) | CRUISES' MOTION FOR SUMMARY |
| corporation, | ) | JUDGMENT |
| | ) | |
| Petitioner, | ) | |
| _____ | ) | |
| | ) | |
| SHIROH FUKUOKA, Individually | ) | |
| and as Personal | ) | CIV. NO. 04-00588 SOM/BMK |
| Representative of the ESTATE | ) | (consolidated) |
| OF MITSUKO FUKUOKA, and as | ) | |
| Next Friend of MIHO FUKUOKA, | ) | |
| a Minor, | ) | ORDER DENYING MORNING STAR |
| | ) | CRUISES' MOTION FOR SUMMARY |
| Plaintiffs, | ) | JUDGMENT |
| | ) | |
| vs. | ) | |
| | ) | |
| MORNING STAR CRUISES, INC., a | ) | |
| Hawaii Corporation; JOHN DOES | ) | |
| 1-10; JANE DOES 1-10; DOE | ) | |
| CORPORATIONS 1-10; DOE | ) | |
| PARTNERSHIPS 1-10; DOE | ) | |
| VENTURERS 1-10; DOE LIMITED | ) | |
| LIABILITY ENTITIES 1-10; DOE | ) | |
| GOVERNMENTAL ENTITIES 1-10; | ) | |
| DOE UNINCORPORATED ENTITIES | ) | |
| 1-10; AND OTHER DOE ENTITIES | ) | |
| 1-10, | ) | |
| | ) | |
| Defendants, | ) | |
| _____ | ) | |

ORDER DENYING MORNING STAR CRUISES' MOTION FOR SUMMARY JUDGMENT

I.      INTRODUCTION.

        This case arises out of an underwater excursion that
allegedly led to the drowning of Mitsuko Fukuoka during either a

"SNUBA" or a "SeaWalker" activity.  In August 2002, Morning Star Cruises, Inc., took Mitsuko Fukuoka, her husband (Shiroh Fukuoka), and her minor daughter (Miho Fukuoka), all Japanese citizens, on an underwater excursion in which the Fukuokas wore helmets connected to tubes designed to pump air into their helmets.  Mitsuko Fukuoka drowned during the excursion (the "Accident").

On July 21, 2006, Morning Star filed a motion for summary judgment, seeking exoneration from or limitation of liability under 46 U.S.C. §§ 181 to 195 (the "Limitation Act"). Because Morning Star fails to meet its initial burden of demonstrating that it is entitled to judgment as a matter of law, and because there are, in any event, issues of fact as to whether Morning Star was negligent, the motion is denied.

II.      SUMMARY JUDGMENT STANDARD.

Summary judgment shall be granted when

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); see also Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir. 2005); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  One of the principal purposes of summary judgment is to identify and dispose of

factually unsupported claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See id. at 323.  A moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden initially falls upon the moving party to identify for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

When the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything.  In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything.  Nissan Fire, 210 F.3d at 1102-03.  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).  The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that

3

there is a genuine issue for trial." Porter, 419 F.3d at 891
(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256
(1986)).  "A genuine dispute arises if the evidence is such that
a reasonable jury could return a verdict for the nonmoving
party." California v. Campbell, 319 F.3d 1161, 1166 (9th Cir.
2003); accord Addisu, 198 F.3d at 1134 ("There must be enough
doubt for a 'reasonable trier of fact' to find for plaintiffs in
order to defeat the summary judgment motion.").

          In setting forth "specific facts," the nonmoving party
may not meet its burden on a summary judgment motion by making
general references to evidence without page or line numbers. S.
Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir.
2003); Local Rule 56.1(f) ("When resolving motions for summary
judgment, the court shall have no independent duty to search and
consider any part of the court record not otherwise referenced in
the separate concise statements of the parties.").  "[A]t least
some 'significant probative evidence'" must be produced. T.W.
Elec. Serv., 809 F.2d at 630 (quoting First Nat'l Bank of Ariz.
v. Cities Serv. Co., 391 U.S. 253, 290 (1968)).  "A scintilla of
evidence or evidence that is merely colorable or not
significantly probative does not present a genuine issue of
material fact." Addisu, 198 F.3d at 1134.  "[I]f the factual
context makes the non-moving party's claim implausible, that
party must come forward with more persuasive evidence than would
otherwise be necessary to show that there is a genuine issue for

4

trial." Cal. Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co., 475 U.S. at 587).

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." T.W. Elec. Serv., 809 F.2d at 631.  In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party.  Porter, 419 F.3d at 891.  The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage.  Id. However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party.  T.W. Elec. Serv., 809 F.2d at 631.

III.    ANALYSIS.

The "Limitation Act", 46 U.S.C. §§ 181 to 195, allows a vessel owner to be exonerated from liability or to "limit liability for damage or injury, occasioned without the owner's privity or knowledge, to the value of the vessel or the owner's interest in the vessel." Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 446 (2001).  The court, sitting without a jury,

adjudicates the claims by determining whether the vessel owner is
liable and whether the owner may limit liability.[1]  Id. at 448.

Limitation Act cases involve a two-step analysis:

> [A] ship owner is entitled to exoneration if
> he, his vessel, and crew are found to be
> completely free of fault.  Even if not
> completely free of fault, the ship owner is
> entitled to limitation of liability if the
> ship owner had no knowledge or privity to the
> ship's negligence or unseaworthiness.  The
> burden of proving negligence lies on the
> person claiming to be injured, but once
> negligence is established, the vessel's owner
> must prove lack of knowledge or privity to
> the negligence.

In re Muer (Muer v. Karbel), 146 F.3d 410, 416 (6th Cir. 1998);
accord Matter of Hechinger (Hechinger v. Caskie), 890 F.2d 202,
207 (9th Cir. 1989) (in Limitation Act cases, the court "must
first determine what acts of negligence or conditions of
unseaworthiness caused the accident" (internal punctuation and
quotations omitted)); Self v. Great Lakes Dredge & Dock Co., 832
F.2d 1540, 1557 (11th Cir. 1987) ("Claimants have the initial
burden of proving negligence or unseaworthiness; once
established, the burden then shifts to the vessel's owner to
prove lack of privity or knowledge." (footnote omitted)).

---

[1]"The Limitation Act was designed to encourage
investment in the shipping industry by limiting the physically
remote shipowner's vicarious liability for the negligence of his
or her water-borne servants."  Suzuki of Orange Park, Inc., v.
Shubert, 86 F.3d 1060, 1064 (11th Cir. 1996).

      A.    To the Extent Morning Star Seeks a Determination
              That it Was Not Negligent and Is Therefore
              Entitled to Exoneration of Liability, the Motion
              <u>Is Denied.</u>

Morning Star's motion initially seeks a summary judgment determination that it was not negligent. Morning Star says that it is therefore entitled to exoneration from liability. In support, Morning Star submits an affidavit by Paul S. K. Yip, the owner of a Morning Star division, indicating that its "staff is trained to follow safety procedures in the event of an emergency," its "crewmembers were trained in the operation, instruction, and first aid procedures for the 'SeaWalker' activity," and its "crew responded to Mitsuko Fukuoka in accordance with [its] procedures." <u>See</u> Affidavit of Paul S. K. Yip (July 21, 2006) ¶¶ 3-5. Morning Star concludes that it "was in no way negligent in the injury of Mitsuko Fukioka." <u>See</u> Yip Aff. ¶ 9. Yip's affidavit, by itself, does not satisfy Morning Star's initial burden on this motion of demonstrating that it is entitled to judgment as a matter of law as to whether it was negligent. <u>See</u> <u>Nissan Fire</u>, 210 F.3d at 1102. Yip's Affidavit does not explain how Mitsuko Fukuoka drowned and therefore does not demonstrate that Morning Star was free of responsibilty for her death. Just because Morning Star's employees were "trained" and just because they acted in accordance with procedures, does not mean that Morning Star had no negligence, as the training and

procedures might have been insufficient.[2]  For example, it might have been Morning Star's procedure to have one dive instructor underwater and one person above water.  Just because that procedure was followed does not mean that Morning Star was not negligent.  For example, it may be that Morning Star had a duty to have three or four dive instructors underwater and that having only one violated Morning Star's duty to properly staff the activity.

        In any event, Morning Star conceded at the hearing that, even if it met its initial burden, a question of fact exists as to whether Morning Star negligently caused the death of

_____

[2]Morning Star argues that, under Local Rule 56.1(g), the Fukuokas are deemed to have admitted all of the material facts set forth in its concise statement because the Fukuokas have not controverted Morning Star's concise statement with a separate concise statement of their own.  The court declines to apply Local Rule 56.1(g) under the circumstances presented here. At the hearing, counsel for the Fukuokas indicated that the failure to file a counter concise statement was an oversight.  He indicated that he had recently received discovery, including Morning Star's manual.  Although the manual was not submitted to the court, the parties do not dispute that it contains a section on what a Morning Star diver is supposed to do when water has entered into a participant's helmet (add air and remove the water).  Morning Star indicated at the hearing that that section applies only when a person's air hose gets cut off far away from the boat, but it is unclear on the present record whether that section has some application here.  Accordingly, it is also unclear whether Morning Star employees followed all applicable procedures in the manual.  Although Morning Star's concise statement also asserts that it was not negligent, Morning Star's alleged negligence is a conclusion of law.  Local Rule 56.1(g) applies to "material facts," rather than conclusions of law. Even in asserting that the crew responded to Mitsuko Fukuoka "in accordance with our procedures," it is unclear whether Yip is going beyond pure facts and is instead opining that particular responses were "in accordance" with procedures, as he interprets those procedures.

Mitsuko Fukuoka.  This question of fact is made clear by the
opinions of the Fukuokas' expert, Thomas C. Ebro, in a
preliminary report issued on June 24, 2005.  <u>See</u> Ex. 1 to
Opposition.  In that report, Ebro stated:

> The fact that this was a snuba activity
> immediately tells us that Mrs. Fukuoka could
> not have drowned unless water had penetrated
> into her helmet.  The only way for water to
> have penetrated into her helmet was for the
> helmet's position to be compromised.  It was
> not reported anywhere that Mrs. Fukuoka
> attempted to remove her helmet.  Moreover, it
> was reported that Mrs. Fukuoka had
> difficultly walking and had given the
> company's distress signal, plus she had
> attempted to climb back up the ladder to the
> surface.  It was incumbent upon Morning
> Star's employees to detect her emergency and
> ensure her safe and timely transport back to
> the surface.  We know that this never
> occurred because she inhaled water and
> drowned.
>
> Mrs. Fukuoka's death was caused by Morning
> Star's failure to detect her emergency and
> respond to her plight.  Morning Star failed
> to conduct a proper safety check beforehand
> to prevent her helmet's position from
> becoming compromised.  Her supervision
> underwater clearly fell below the standard of
> care.  The "*instructor/guides[,]*" who should
> have been closely watching her, failed to
> detect the onset of her emergency and
> responded too late.  In my opinion, Mrs.
> Fukuoka's death was entirely preventable.
> Morning Star's negligent safety planning and
> underwater supervision egregiousness caused
> this needless drowning.

<u>Id.</u>

Ebro's expert report raises the possibility that
Morning Star was negligent because (1) its employees did not

9

ensure that water would stay outside of Mitsuko Fukuoka's air-filled helmet, (2) its employees did not recognize or recognized too late that Mitsuko Fukuoka was having trouble underwater, (3) it did not have sufficient employees to respond to her plight and safely transport her back to the surface and/or a hospital, and (4) its employees did not properly respond to her plight and safely transport her back to the surface and/or a hospital. Given the absence of exact details of what occurred the day Mitsuko Fukuoka drowned, Ebro's report raises the possibility that Morning Star negligently caused Mitsuko Fukuoka's drowning.

Morning Star argues that Ebro's opinions should be disregarded as unreliable.  Rule 702 of the Federal Rules of Evidence governs the admissibility of expert opinion testimony.  United States v. Finley, 301 F.3d 1000, 1007 (9th Cir. 2002). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court has "charged trial judges with the responsibility of acting as gate-keepers to 'ensure that any and all [expert] testimony or evidence admitted is not only relevant, but reliable.'"  Id. at 1007-08 (citing Daubert v. Merrell Dow

10

Pharms., Inc., 509 U.S. 579, 589 (1993); Kumho Tire Co. v.
Carmichael, 526 U.S. 137, 147 (1999)).  The Ninth Circuit has
stated that a "trial court not only has broad latitude in
determining whether an expert's testimony is reliable, but also
in deciding how to determine the testimony's reliability."
Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998,
1017 (9th Cir. 2004).

     Morning Star argues that Ebro's report is unreliable
because it refers to a "SNUBA" activity, while Morning Stars says
that Mitsuko Fukuoka drowned during a "SeaWalker" activity.
Morning Star also argues that Ebro's opinions should be
disregarded as unreliable because his preliminary report was
issued before any discovery was requested or produced.  The court
is unconvinced that either of these circumstances makes Ebro's
opinions unreliable.

     Morning Star does not explain how "SNUBA" and
"SeaWalker" activities "differ" in any manner material to this
case.  See Reply (Aug. 10, 2006).  It is undisputed that Mitsuko
Fukuoka was wearing some type of helmet that was supposed to
allow her to breathe underwater.  It is also undisputed that
Mitsuko Fukuoka's drowning occurred while she was wearing that
helmet.  Ebro's opinion that water does not normally get into a
helmet does not appear to turn on any difference between "SNUBA"
and "SeaWalker" activities.  Nor do his opinions as to whether
Morning Star properly monitored and responded to her plight
appear to turn on any difference between "SNUBA" and "SeaWalker"

activities.  Moreover, Ebro's issuance of his opinion before the
Fukuokas conducted discovery goes to the weight, rather than
admissibility, of his opinions.[3]

The interrogatories submitted by Mitsuko Fukuoka's
husband and daughter factually support Ebro's opinions as to how
Morning Star was negligent.  These interrogatories indicate that
Mitsuko Fukuoka had been underwater for only a few minutes before
giving the distress sign and that she had attempted to climb the
dive ladder to the boat on the surface.  They indicate that
Mitsuko Fukuoka appears to have passed out while climbing the
ladder and to have fallen back towards the ocean floor.  She then
had to be pulled to the surface.  See Response to Interrogatory
No. 9 to Miho Fukuoka (Ex. 2); Response to Interrogatory No. 9 to
Shiroh Fukuoka (Ex. 3).[4]  It may be that, when Mitsuko Fukuoka
fell towards the ocean floor, water entered her helmet, causing
her to drown.  Because it appears that she was being assisted to
the surface by a Morning Star employee when she fell back towards
the ocean floor, there is also a question of fact as to whether
Morning Star negligently responded to Mitsuko Fukuoka's

---

[3]Even if the court excluded Ebro's opinions, Morning
Star has not explained how water entered Mitsuko Fukuoka's
helmet.  Without such an explanation, and without a discussion of
how Morning Star employees responded to Mitsuko Fukuoka's
emergency situation, the court cannot determine as a matter of
law that Morning Star was not negligent.

[4]Although the copies of the answers to interrogatories
submitted to the court are unsigned, the parties agreed at the
hearing that signed copies of the same answers to interrogatories
exist.

situation.  It might be that a Morning Star employee negligently assisted her up the ladder or that Morning Star failed to have sufficient personnel to ensure her safety.[5]

The court's determination that a question of fact exists as to whether Morning Star was negligent is buttressed by the ambulance and emergency room reports, Exhibits 4 and 5 to the Opposition, which both indicate that Mitsuko Fukuoka was being helped to the surface, thereby factually supporting Ebro's opinions.  The ambulance report, for example, states that "Dive Staff" told the emergency medical technicians ("EMTs") that Mitsuko Fukuoka was "pulled from water unresponsive while ascending from [approximately] 15 ft. of seawater while 'snuba' type diving."  The ambulace report further indicates that the

---

[5]At the hearing, Morning Star questioned whether Miho and Shiroh Fukuoka had personal knowledge of what happened to Mitsuko Fukuoka after she gave the distress sign.  See Answers to Interrogatories No. 9 (identically stating that "Neither my daughter nor I were aware of what was happening to Mitsuko from this time on" in a sentence describing what was happening immediately before Mitsuko gave the distress sign).  Morning Star therefore argues that, under Rule 602 of the Federal Rules of Civil Procedure, they cannot testify as to those facts.  On the present record, it is unclear whether Miho and Shiroh Fukuoka have personal knowledge sufficient to testify about what happened after Mitsuko gave the distress sign.  Nevertheless, because the court must interpret the evidence and inferences in the light most favorable to the nonmoving party and because the court does not make credibility determinations or weigh conflicting evidence when evaluating motions for summary judgment, see Porter, 419 F.3d at 891, the court must assume for purposes of this motion that Miho and Shiroh Fukuoka have personal knowledge of the facts subsequent to Mitsuko Fukuoka's giving of the distress signal.  The court notes that Morning Star could have clarified whether Miho and Shiroh Fukuoka have personal knowledge of the events with deposition testimony or other evidence.

"Staff" told the EMTs that Mitsuko Fukuoka was "assisted to [the] surface."  The Castle Medical Center report similarly indicates that Mitsuko Fukuoka was being "assisted" to the surface.

On a summary judgment motion such as this, the court need not decide whether the ambulance and medical reports will be admissible at trial, as the court does not focus on the admissibility of the evidence itself, but of its contents.  See Fraser v. Goodale, 342 F.3d 1032, 1036-37 (9th Cir. 2003) ("we need not decide whether the diary itself is admissible.  It would be sufficient if the contents of the diary are admissible at trial, even if the diary itself may be inadmissible.  At the summary judgment stage, we do not focus on the admissibility of the evidence's form.  We instead focus on the admissibility of its contents.  The contents of the diary are mere recitations of events within Fraser's personal knowledge and, depending on the circumstances, could be admitted into evidence at trial in a variety of ways."); Block v. City of Los Angeles, 253 F.3d 410, 418-19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56.").

Statements made by dive personnel regarding what happened underwater and the circumstances surrounding how Mitsuko Fukuoka drowned could be admitted in a number of ways.  Morning Star's employees could testify as to what happened and what they

14

said.  See Fed. R. Evid. 602.  The emergency medical technicians
and personnel could testify about statements made for purposes of
medical diagnosis or treatment that are describing the inception
or general character of the cause of Mitsuko Fukuoka's medical
problem under Rule 803(4) (statements for purposes of medical
diagnosis or treatment) of the Federal Rules of Evidence.  Anyone
who heard the Morning Star employees describe the circumstances
could testify about what the employee said under Rule 804(3)
(statement against interest) of the Federal Rules of Evidence.  A
question of fact therefore exists as to whether Morning Star was
negligent.

> B.    To the Extent Morning Star Seeks a Determination
>        That it Had No Knowledge or Privity With Respect
>        to the Negligence, Summary Judgment is Denied.

The Limitation Act "limits vessel owners' liability for
claims, arising from acts performed by a ship's crew without the
owner's knowledge or privity, to the owners' interests in the
ship."  In re Paradise Holdings, Inc. (Stone v. Paradise
Holdings, Inc.), 795 F.2d 756, 758 (9th Cir. 1986); State of Or.
By & Through State Highway Com'n v. Tug Go-Getter, 468 F.2d 1270,
1274 (9th Cir. 1972) ("Under the Limitations Act, 46 U.S.C.
§§ 183-189, the owner of a vessel held at fault in a collision is
entitled to limit his liability to the value of the vessel if the
negligent acts or conditions were without his privity or
knowledge.").  Morning Star's motion seeks a determination that,
even if it were negligent, it is entitled to limit its liability

because it had no knowledge or privity with respect to the negligence.  This part of Morning Star's motion is denied.

The Limitation Act does not define the phrase "privity or knowledge."  Courts have defined "privity or knowledge" as an owner's personal participation in the fault or negligence which caused or contributed to the loss or injury.  See, e.g., Univ. of Texas Med. Branch at Galveston v. United States, 557 F.2d 438, 447 (5th Cir. 1977) ("in order to invoke the Limitation Act a shipowner must not have been personally negligent, i. e., the negligence of his ship's master or crew must not have been within his 'privity or knowledge'").  Because Morning Star is a corporation, the court focuses on whether the alleged

> negligence is that of 'managing officers' or, more properly, 'supervisory employees.'  The title or rank of these employees is, by itself, of limited value in determining on which side of the line a particular case falls.  While this may be one factor, the real test is not as to their being officers in a strict sense but as to the largeness of their authority.

United States v. Standard Oil Co. of Cal., 495 F.2d 911, 917 (9th Cir. 1974) (quotations and citation omitted); The Princess Sophia (Brace v. Canadian Pac. Ry. Co.), 61 F.2d 339, 346 (9th Cir. 1932) ("When the owner is a corporation, the privity or knowledge must be that of its managing officers.").

Whether Morning Star had privity or knowledge for purposes of the Limitation Act depends on the facts of this particular case, see Coryell v. Phipps, 317 U.S. 406, 411 (1943)

16

("Privity like knowledge turns on the facts of particular cases."), and Morning Star has the burden of proving a lack of privity or knowledge by a preponderance of the evidence. See Waterman S.S. Corp. v. Gay Cottons, 414 F.2d 724, 737-38 (9th Cir. 1969).

        The only evidence submitted by Morning Star in support of its contention that it had no privity or knowledge for purposes of the Limitation Act is Yip's affidavit. That affidavit states that, "[p]rior to the incident . . . [,] Morning Star Cruises, Inc.[,] had no prior notice or knowledge of problems with the vessel, our procedures, or the 'SeaWalker' system."[6] Because the court does not know how or why Mitsuko Fukuoka drowned, Yip's affidavit is insufficient to establish that Morning Star had no "knowledge or privity" with respect to its possible negligence. Without knowledge of what caused the drowning, the court cannot accept an assertion that a party did not know of negligence that may have contributed to the Accident. For example, if Morning Star was negligent because it did not assign enough employees to the excursion, Morning Star may have had "privity or knowledge" of that negligence because some supervisory or managerial level employee/officer knew about or decided on the limited number of employees at the excursion site

_____

        [6]This court need not deem the statement that "Morning Star Cruises had no knowledge or privity of the negligence" in Morning Star's concise statement to be admitted under Local Rule 56.1(g). That statement does not go to facts, but, rather, to a legal conclusion.

at the time of the Accident.  Morning Star has failed to meet its initial burden on this motion for summary judgment.  See Nissan Fire, 210 F.3d at 1102-03.  Morning Star would have this court rule that Morning Star had no knowledge or privity (i.e., some personal involvement) with respect to some unidentified act of negligence.  This procedure would run contrary to logic and established Ninth Circuit precedent requiring this court to first determine what acts of negligence caused the Accident.  See Matter of Hechinger, 890 F.2d at 207.

IV.    CONCLUSION.

    For the foregoing reasons, Morning Star's motion for summary judgment is denied.


        IT IS SO ORDERED.


        DATED: Honolulu, Hawaii, August 24, 2006.




        _____
        Susan Oki Mollway
        United States District Judge


In re Morning Star Cruises, et al., Civ. Nos. 03-00672 SOM/BMK and 04-00588 SOM/BMK; ORDER DENYING MORNING STAR CRUISES' MOTION FOR SUMMARY JUDGMENT